**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 23, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

BEN JARVISON,

      Defendant - Appellee.

No. 04-2093

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR 04-0073)

Marron Lee, Assistant United States Attorney (David C. Iglesias, United States
Attorney with her on the brief), Albuquerque, New Mexico, for the Plaintiff-
Appellant.

Robert J. Gorence, Robert J. Gorence & Associates, P.C., Albuquerque, New
Mexico, for the Defendant-Appellee.

Before **KELLY** , **ANDERSON** , and **LUCERO** , Circuit Judges.

**LUCERO** , Circuit Judge.

      In this interlocutory appeal involving a claim that the defendant, Ben

Jarvison, is not validly married, the United States contests the district court's

exclusion of testimony on the basis of the spousal testimonial privilege. As part of the underlying child sexual abuse prosecution, the United States sought to compel the testimony of Esther Jarvison who they contend observed the abuse and could testify as to statements concerning the abuse made to her by both the defendant Ben Jarvison and the alleged victim. After determining that the Jarvisons had a valid marriage, the district court denied the government's motion to compel Esther's testimony. On appeal, the government argues that the district court erred in refusing to compel Esther's testimony on the basis of the spousal testimonial privilege, and in the alternative invites us to create a new exception to the spousal testimonial privilege for child abuse cases. Exercising jurisdiction under 18 U.S.C. § 3731, we **AFFIRM** the district court's order denying the government's motion to compel Esther Jarvison's testimony and decline the government's invitation to create a new exception allowing courts to compel adverse spousal testimony in cases involving allegations of child abuse.

## I

This appeal centers around Esther Jarvison's ("Esther") refusal to testify against Ben Jarvison ("Jarvison") in a criminal case in which Jarvison is accused of sexually abusing their granddaughter, Jane Doe. After the government indicted Jarvison for aggravated sexual abuse of a minor child in Indian Country, it attempted to compel Esther to testify against Jarvison. Esther, an 85-year-old

2

Navajo woman who speaks quite limited English, and Jarvison, who is 77 years old, are residents of the Navajo Indian Reservation and enrolled members of the Navajo Tribe. Jarvison also speaks only limited English, and communicates mostly in Navajo. The testimony proffered by the government involves statements allegedly made by Esther to Federal Bureau of Investigation ("FBI") and Navajo Police investigators in an untaped, English-language interview. The government contends that Esther stated that she observed the child touch Jarvison's penis "over his pants," that Jane Doe allegedly told Esther that Jarvison had touched her private parts, and that Jarvison told Esther that the child had touched him over the crotch of his pants and he had told her not to do so.[1] Esther denies that she made such statements.

As part of its pretrial preparations, the government served Esther with a subpoena to compel testimony two days before a pretrial hearing in this case. During the hearing, Esther emphatically stated that she did not want to testify against her husband and that she and Jarvison had married in a traditional Navajo ceremony in Coyote Canyon within the Navajo Reservation on June 25, 1953.

---

[1] At the time of the hearing, Jane Doe's father was also being investigated for raping Jane Doe. This alleged crime, however, occurred outside the jurisdiction of the United States and was pending prosecutorial decision in the Eleventh Judicial District Attorney's Office in Gallup, New Mexico. The existence of this additional abuse allegation is relevant, however, in the current prosecution as it could potentially provide Jarvison's defense with an explanation for the sexual knowledge of the minor victim.

The district court found that the Jarvisons had a valid marriage based on this 1953 traditional Navajo ceremony, and concluded that the spousal testimonial privilege applied under Trammel v. United States, 445 U.S. 40 (1980).

Before the district court, the government argued that the marriage was not valid because: (1) Esther had not testified to every element of a "traditional ceremony" under the Navajo Code; (2) the Jarvisons had not recorded the traditional marriage with the Navajo tribal government; and (3) an intervening relationship with Esther's daughter had extinguished any marriage. The government's proffer included proposed evidence that the Jarvisons lived together from 1953 until 1965, at which point Esther moved out upon Jarvison's commencement of a sexual relationship with Esther's daughter from a prior marriage. Jarvison had two children with Esther prior to 1965, and four children with the daughter over the next fifteen years. In 1980, the relationship with the daughter ended, and Esther moved back in with Jarvison. Over the ensuing years, Esther and Jarvison separated and reconciled multiple times, and in 2000 began to live together again on a full-time basis. The documents submitted by the government reflect that in 2002, when the alleged sexual abuse occurred, Esther was living with Jarvison and was still cohabiting with him in 2003 when interviewed by the FBI and Navajo Police about the alleged abuse. These FBI statements relied upon by the government state that "[Esther] JARVISON and

4

BEN have been married for over 50 years."

The court allowed the government to present a witness from the Navajo Vital Records Office to testify to certain records on Jarvison maintained by the Navajo Nation that stated "no" in the block marked "married," but did list Esther as Jarvison's "wife." These documents also listed all of Jarvison's children as Esther and Jarvison's. After the court denied its motion to compel Esther's testimony on the basis of the existence of a valid marriage and the spousal testimonial privilege under Trammel, the government requested reconsideration and moved to supplement the record with additional documentary evidence to show that no valid marriage had ever occurred. These two exhibits consisted of the two investigatory reports made in 2003. The court admitted the documents but found they contained nothing that would cause it to reexamine its conclusion that the Jarvisons were married and that spousal testimonial privilege applied.[2]

---

[2] The government contends that the district court's denial of the opportunity to cross examine Esther on her marriage was prejudicial. Unless we are convinced that the ruling of the court was prejudicial, the trial court is the governor of the trial with the duty to assure its proper conduct and the limits of cross-examination necessarily lie within its discretion. See United States v. Begay, 144 F.3d 1336, 1339 (10th Cir. 1998) (review of limitations on cross-examination of witnesses for abuse of discretion); United States v. Jackson, 482 F.2d 1167 (10th Cir. 1973) (exercise of discretion on extent of cross-examination should not be overruled unless we are convinced the court's ruling is prejudicial). Although the district court should have allowed the Government to cross-examine Esther on her claim of marriage, its failure to do so must be evaluated for prejudice after considering the totality of the evidence presented on the marriage. In addition to allowing the

(continued...)

5

This interlocutory appeal by the government followed.

**II**

When reviewing a district court decision to exclude evidence, we review the district court's decision for an abuse of discretion. United States v. Wittgenstein, 163 F.3d 1164, 1172 (10th Cir. 1998). Although we review legal issues de novo, United States v. Kirk, 894 F.2d 1162, 1163 (10th Cir. 1990), we must accept the court's factual findings unless we conclude they were clearly erroneous. Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998). A finding of fact is not clearly erroneous unless "it is without factual support in the record," or unless the court "after reviewing all the evidence, is left with a definite and firm conviction that the district court erred." Id. We view the evidence on appeal in the light most favorable to the district court's ruling, giving due regard to the district court's opportunity to judge witness credibility, and must uphold any district court finding that is permissible in light of the evidence.

---

[2](...continued)
government to present a witness and records from the Navajo Vital Records Office, the district court allowed the government to present a proffer of what they believed the evidence would show, as well as allowing the government to supplement the record in its motion for reconsideration. Although the court itself conducted the examination of Esther and limited the cross examination due to the witness's age and frailty, it provided the government with a full opportunity to call other witnesses and to present a proffer of what they believed Esther's testimony would establish. After evaluating the record, we are not convinced that the court's ruling under these circumstances was prejudicial.

Id. at 813.

The United States contends that the district court erred in determining that the Jarvisons were married under traditional Navajo law, and that even if married, the marriage was a sham or moribund and was created solely to avoid testifying. The second argument – that the marriage was a sham or moribund and was created solely to avoid testifying – was not raised or argued below before the district court in either the government's original motion or motion to reconsider. Accordingly, we decline to address it for the first time on appeal. See Singleton v. Wulff, 428 U.S. 106, 120 (1976); In re Walker, 959 F.2d 894, 896 (10th Cir. 1992).[3]

## A

Our analysis of the district court's conclusion that the Jarvisons had a valid marriage requires us first to examine what law would apply to the question of a marriage between two Navajo tribal members who live completely within the boundaries of the Navajo Reservation. The district court implicitly evaluated the

---

[3] The government's own evidence directly contradicts this argument. In the government's supplement to the record on its motion to reconsider, allowed by the district court, the FBI statement concerning Esther's interview on April 25, 2003 reflects that long before any indication of a criminal prosecution, Esther told the investigating agent that she and the defendant had been "married for over 50 years" and further in its motion for reconsideration, the government stated that Esther had been living with Jarvison since 2000. Even presuming the facts adduced by the government as true, the government makes no showing that would support a conclusion that the marriage was either a sham or moribund.

7

marriage under Navajo law stating that: "The Court is of the opinion that a marriage legal in the Navajo Nation 50 years ago is still legal." It is often assumed without discussion by courts that, in cases arising on an Indian Reservation within a State, the substantive law of the State is controlling in such situations. Louis v. United States, 54 F.Supp. 2d 1207, 1209-10 (D.N.M. 1999). However, because the Navajo Nation retains sovereign authority to regulate domestic relations laws, including marriage of its Indian subjects, Navajo law is dispositive as to the validity of the marriage in question. See Montana v. United States, 450 U.S. 544, 564 (1981) ("Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members"); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55-56 (1978) ("Although no longer possessed of the full attributes of sovereignty, they remain a separate people, with the power of regulating their internal and social relations."); Cheromiah v. United States, 55 F.Supp. 2d 1295, 1305 (D.N.M. 1999) (examining the sovereignty retained by Indian tribes and law of the place in Federal Torts Claims Act case); Jim v. CIT Financial Services Corp., 533 P.2d 751, 752 (N.M. 1975) (recognizing that laws of the Navajo Tribe are entitled by Federal law to full faith and credit in the courts of New Mexico because the Navajo Nation is a "territory" within the meaning of 28 U.S.C. § 1738); Halwood v. Cowboy Auto Sales, Inc., 946 P.2d 1088, 1090 (N.M. App.

8

1997) (same). The government assumes that New Mexico law is the applicable law by which to measure the validity of the marriage, but discusses Navajo law because New Mexico recognizes valid common law marriages from other jurisdictions.

Both Esther and Ben Jarvison are subject to Navajo Nation laws regarding marriage and domestic relations. Because domestic relations are considered by the Tribe as being at the core of Navajo sovereignty, In re Francisco, 16 Indian L. Rep. 6113 (Navajo 1989),[4] we conclude that Navajo law is the appropriate law under which to evaluate the validity of the marriage. See Montana, 450 U.S. at 565; Marris v. Sockey, 170 F.2d 599 (10th Cir. 1948) (holding that tribal Indians domiciled within the territorial limits of an Indian nation in Indian Territory and who consummated a marriage or divorce in accordance with recognized tribal custom before such customs had been superceded by other law, were bound by the legal effect given to such customs); see also Beller v. United States, 221 F.R.D. 679 (D.N.M. 2003) (determining validity of a Navajo couple's marriage by examining required elements of common law marriage under Navajo law).

---

[4] Available at: http://www.tribalresourcecenter.org/opinions/opfolder/1989.NANN.0000013.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

**B**

Navajo law currently recognizes multiple ways to establish a valid marriage. It recognizes both those marriages contracted outside the Navajo Reservation (if valid by the laws of the place where contracted), and those within the Reservation under the requirements of Title 9 of the Navajo Nation Code. Navajo Code recognizes both traditional and common law marriage. Navajo Code tit. 9, §§ 3 and 4 (1993).[5] Because the alleged marriage in this case spans more than a fifty-year period, a proper understanding of the evolution of Navajo law on traditional and common-law marriage is required to resolve the validity of the Jarvisons' marriage.

Under Navajo tradition, celebration of a traditional marriage ceremony and the knowledge thereof by the community were sufficient to create a valid marriage. A marriage license or other documentation was unnecessary. See In re Francisco, 16 Indian L. Rep. 6113 ("After [participating] in the traditional Navajo wedding ceremony, some couples do not obtain marriage licenses because, traditionally, the performance of the ceremony completely validates the union."); see also Antoinette Sedillo Lopez, Evolving Indigenous Law: Navajo Marriage-

---

[5] Navaho Code (NNC) tit. 9, § 1, provides: "Validity generally. A. Marriages contracted outside of Navajo Indian Country are valid within Navajo Indian Country if valid by the laws of the place where contracted. B. Marriages may be contracted within Navajo Indian Country by meeting the requirements of 9 NNC §§ 3 and 4."

Cultural Traditions and Modern Challenges, 17 Ariz. J. Int'l & Comp. L. 283, 292 (2000). Navajo marriages have been governed by tribal statute since 1940 when the Tribal Council passed a Resolution requiring Navajo couples desiring to marry in a traditional ceremony to obtain a marriage license. See Lopez, supra at 293; Navajo Tribal Council Res. CJ-2-40 (June 3, 1940) (recognizing that the overwhelming number of Navajo who have not been to school are married by tribal custom). Despite the seemingly clear language in this Resolution, subsequent Navajo court decisions interpreted the Resolution as making the license requirement "directory" rather than mandatory, and court decisions and subsequent Tribal Council Resolutions recognized the validity of both unlicensed traditional and common law marriages. This apparent conflict between the desire to formalize marriage by requiring a license and the desire to respect tribal custom and belief concerning traditional marriage[6] reflects the tension between the necessity of proving marriage in the modern bureaucratic state,[7] and Navajo

---

[6] "Traditional Navajo society places great importance upon the institution of marriage. A traditional Navajo marriage, when consummated according to a prescribed elaborate ritual, is believed to be blessed by the 'Holy People.' This blessing ensures that the marriage will be stable, in harmony, and perpetual." Navajo Nation v. Murphy, 6 Navajo Rptr. 10, 13 (Navajo 1988). Also available at: http://www.tribalresourcecenter.org/opinions/ opfolder/1988.NANN. 0000001.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

[7] The Navajo inclusion of a license requirement was established in response to difficulties experienced by tribal members attempting to establish rights to

(continued...)

law's commitment to incorporate Navajo tradition as a source of law.  See

Bennett v. Navajo Board of Election Supervisors, No. A-CV-26-90 (Navajo 1990)

(holding that fundamental Navajo customs and traditions are part of "higher

law");[8] Navajo Tribal Council Res. CAP-36-80 (Apr. 30, 1980) (recognizing

difficulty in obtaining government benefits caused by inability to validate

traditional marriages).

In 1944 the Tribal Council validated preexisting marriages recognized by

the community even though not accompanied by church, state, or Tribal custom

ceremony.  See Unnumbered Navajo Tribal Council Res. amending CJ-2-40 (July

18, 1944); In re Francisco, 16 Indian Law Rep. 6113; see also Navajo Code, tit. 9

§ 8 (the 1944 amendment was the precursor to the current §8).  Recognizing that

Navajo couples had continued to marry through unlicensed traditional ceremonies,

in 1954 the Tribal Council adopted a resolution validating all pre-January 31,

1954 Navajo marriages that were out of compliance with earlier Navajo Tribal

Council resolutions requiring a license.  David L. Lowery, Developing a Tribal

Common Law Jurisprudence: The Navajo Experience, 1969-1992, 18 Am. Indian

---

[7](...continued)
government pensions and survivor's benefits under Social Security and other compensation programs.    See Navajo Tribal Council Res. CAP-36-80 (Apr. 30, 1980).

[8] Available at:   http://www.tribalresourcecenter.org/opinions/opfolder/1990. NANN. 0000016.htm   (as visited on May 3, 2005, and available in the Clerk of Court's case file).

L. Rev. 379, 405 (1993); In re Francisco, 16 Indian L. Rep. 6113; Navajo Tribal Council Res. CF-2-54 (Feb. 11, 1954) ((codified at Navajo Code tit. 9, § 61, (1977), amended by Navajo Tribal Council Res. CAP-36-80 (Apr. 30, 1980)). In 1957, the Tribal Council, recognizing the frequent necessity of documentary proof of marriage, established a procedure allowing those whose prior marriages were validated by the 1954 resolution, to petition for a formal recognition of marriage through the Navajo courts. Navajo Tribal Council Res. CF-14-57 (Feb. 4, 1957). Although the 1954 resolution requiring marriage licenses was passed to avoid problems in obtaining government benefits for dependents by encouraging tribal members to obtain marriage licenses, Navajo courts subsequently validated "customary" marriages that occurred after the January 31, 1954 date as "common law" marriages, thus achieving the same result. See Lowery, supra at 405; In re Marriage of Daw, 1 Navajo Rptr. 1, 3 (Navajo Ct. App. 1969).[9] Ten years later, the Navajo courts acknowledging the language of the 1954 Tribal Council Resolution again held that "any marriage contracted by tribal custom after January 31, 1954, may not be validated by the tribal court, but is recognized as a common law marriage." In re Marriage of Ketchum, 2 Navajo Rptr. 102, 105 (Navajo Ct.

---

[9] Also available at: http://www.tribalresourcecenter.org/opinions/ opfolder/ 1969.NANN.0000001.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

App. 1979).[10]  The court's In re Ketchum opinion listed the requirements of a common law marriage as:  (1) present consent to be husband and wife; (2) actual cohabitation; and (3) actual holding out to the community to be married.  Lowery, supra at 405-06; In re Ketchum, 2 Navajo Rptr. 102, 104-105 citing Kelly v. Metropolitan Life Ins. Co., 352 F.Supp. 270 (S.D.N.Y. 1972) (listing essential features of common law marriage), and Meister v. Moore, 96 U.S. 76 (1878) (deciding that common law marriage exists absent a statute to the contrary).

In 1980, the Tribal Council eliminated the January 31, 1954 cutoff date for the validation of traditional Navajo marriages that had been entered into without licenses, recognizing both that the Navajo people had continued to marry in traditional ceremonies since 1954 and that the "law of validated marriages has created problems and hardships for numerous married Navajo people."  Lopez, supra at 296; Navajo Tribal Res. CAP-36-80 (Apr. 30, 1980).  However, in an effort to encourage the move toward formalization and to ease the problem of accurate record keeping, the Tribal Council urged the Navajo people to obtain Navajo Tribal marriage licenses prior to marriage and record them within three months.  By eliminating the cutoff date, the Council allowed all traditional marriages to be validated, extending federal benefits normally afforded to married

---

[10] Also available at:  http://www.tribalresourcecenter.org/opinions/opfolder/ 1979. NANN.0000007.htm   (as visited on May 3, 2005, and available in the Clerk of Court's case file).

couples to those Navajo couples "who were recognized in the community as being married and who considered themselves spiritually united in accordance with Navajo cultural and religious tradition." Lopez, supra at 296 (citing Navajo Tribal Council Res. CAP 36-80 (Apr. 30, 1980)).

Although the Supreme Court of the Navajo Nation confirmed the institution of common law marriage in a 1988 decision, Navajo Nation v. Murphy, 6 Navajo Rptr. 10,[11] in 1989 it ruled that "Navajo tradition and culture do not recognize common-law marriage," and overruled all prior rulings permitting Navajo courts to validate unlicensed marriages in which a Navajo traditional ceremony had not occurred. Lowery, supra at 406; In re Marriage of Francisco, 16 Indian L. Rep. 6113 (Navajo 1989). While declaring "Anglo-style" common law marriages invalid as contrary to Navajo tradition in In re Francisco, the Navajo Supreme Court reaffirmed its responsibility under CAP 36-80 to validate unlicensed marriages consecrated with a traditional ceremony. Lowery, supra at 406; In re Francisco, 16 Indian L. Rep. 6113; Lopez, supra at 299. In 1993, the Tribal Council rejected the Navajo Supreme Court's holding in In re Francisco

---

[11] In Murphy, the court recognized that marriage was an important aspect of Navajo culture and that the legal doctrine of spousal privilege was justified by Navajo society's interest in preserving the harmony and sanctity of marriage. Murphy , 6 Navajo Rptr. at 13. Also available at: http://www.tribalresourcecenter. org/ opinions/ opfolder/1988.NANN.0000001.htm   (as visited on May 3, 2005, and available in the Clerk of Court's case file).

15

invalidating common law marriages and explicitly included common law marriages in the Navajo Code. Navajo Nation Code, tit. 9, sec. 3 (1993); Lopez, supra at 299.

Current Navajo law allows parties to contract marriage through a traditional ceremony or by common-law marriage within the Navajo Nation as follows:

> D. The contracting parties engage in a traditional Navajo wedding ceremony which shall have substantially the following features:
>> 1. The parties to the proposed marriage shall have met and agreed to marry;
>> 2. The parents of the man shall ask the parents of the woman for her hand in marriage;
>> 3. The bride and bridegroom eat cornmeal mush out of a sacred basket;
>> 4. Those assembled at the ceremony give advice for a happy marriage to the bride and groom;
>> 5. Gifts may or may not be exchanged;
>> 6. The person officiating or conducting the traditional wedding ceremony shall be authorized to sign the marriage license, or
>
> E. The contracting parties establish a common-law marriage, having the following features:
>> 1. Present intention of the parties to be husband and wife;
>> 2. Present consent between the parties to be husband and wife;
>> 3. Actual cohabitation;
>> 4. Actual holding out of the parties within their community to be married.

Navajo Code, tit. 9 § 3. Against this checkered statutory and historical background we assess the district court's determination in this case.

**C**

16

Although later conceding that New Mexico recognizes valid common law marriages from other jurisdictions, the government initially contends that the district court erred when it determined that a valid marriage existed between the Jarvisons because New Mexico law does not recognize common law marriage. We reject the government's first argument for the reasons stated above. Additionally, the government contends that there was insufficient evidence to support the district court's conclusion that the Jarvisons had a traditional ceremonial marriage under the Navajo Code. Moreover, because the Jarvisons had not completed the procedure under Navajo law to validate a traditional or common law marriage, the government argues that their marriage was invalid.

In evaluating the government's contentions, we observe that the district court could have produced a more robust order detailing its findings of fact and evidentiary basis similar to the detailed findings of fact and conclusions of law in Beller v. United States, 221 F.R.D. 679 (D.N.M. 2003). Nonetheless, on our review of the record, we conclude that the evidence in the record is sufficient to establish a valid marriage between the Jarvisons. See United States v. Taylor, 97 F.3d 1360, 1364 (10th Cir.1996) (holding that despite a trial court's failure to make specific factual findings, an appellate court is free to affirm on any grounds for which there is sufficient record to permit conclusions of law).

In this case, Esther testified to having married Jarvison in a traditional

17

Navajo ceremony on June 25, 1953 at Coyote Canyon within the Navajo Reservation. She identified the particular Navajo medicine man who performed the ceremony. She answered yes when the court asked her "[is] that a traditional marriage under Navajo law?" Although the government makes much of the fact that Esther did not testify to the exact requirements outlined in the Navajo Code provision, the statute itself requires only that the couple "engage in a traditional Navajo wedding ceremony which shall have <u>substantially</u> the following features . . . ." Navajo Code, tit. 9 § 3D (emphasis added). Esther's testimony and the inferences arising therefrom support the district court's conclusion that a valid traditional Navajo marriage ceremony occurred in 1953, crediting "due regard to the district court's opportunity to judge witness credibility." <u>Manning</u>, 146 F.3d at 813. Under Navajo law, such an unlicensed traditional marriage occurring prior to 1954 was valid. <u>See</u> Navajo Tribal Council Res. CF-2-54, Feb. 11, 1954; <u>see also</u> Navajo Code, tit. 9 § 3D.

Review of the government's evidence of record further supports the conclusion that the Jarvisons' ceremony would be considered valid under Navajo law. In explaining the Navajo Nation records concerning the Jarvisons, Ms. Gertrude Peshlakai, a statistics technician from the Navajo Nation, testified that the Tribe recognized the marriages of many of the elderly Navajos who were married in traditional ceremonies in the forties and fifties who often did not have

18

their marriages validated by the Tribe either as a traditional ceremony or as a common-law marriage. Although recognizing the internal inconsistencies on the Navajo Records,[12] Peshlakai testified that the census records indicated to her that "the individual might have had a traditional wedding." Her answers to somewhat tortured questions by counsel are relevant to our evaluation:

> Question by defense counsel: "Okay, And what would that mean, then, in terms at least the tribe recognizing that term of wife in the context of whether or not there's a real marriage, in a traditional sense? What does that mean to me?"
> Peshlakai: "That means they had a traditional wedding."
> Defense Counsel: "And does – you used the term 'elderlies' before. But was it prevalent in the forties and fifties that on occasion people who were married in a traditional sense on the Navajo Reservation did not obtain what you call the paperwork to actually get a marriage license like it's done now?"
> Peshlakai: "Yes."
> Defense Counsel: "The tribe, I take it, recognizes those, quote, elderlies as married, don't they?"
> Peshlakai: "Yes."

Thus, testimony from the government's witness establishes that the Tribe does

---

[12] The record listed "Esther Jarvison" as "Jarvison's wife" but did not list any information as to the date or type of marriage. Although the court recognized that other inaccuracies existed on the record, such as listing all of Jarvison's children as those of Esther and Jarvison when some were those of Jarvison and Esther's daughter, it held that merely because an official record did not conclusively establish their "marriage," it did not mean that they were not married under Navajo tradition and law. Because Navajo society is matrilocal and matrilineal, traditionally, the father and children live with the mother's family, children are said to "belong" to the mother's clan. See Apache v. Republic National Life Insurance Co. , 3 Nav. Rptr. 250, 252 (1982). Also available at: http://www.tribalresourcecenter.org/opinions/opfolder/1982.NANN. 0000059.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

recognize "elderlies," such as Esther and Ben Jarvison, as married even if the marriage is not validated or licensed.

The Jarvisons' failure to license or validate their 1953 traditional marriage does not result in their marriage being invalid under Navajo law. As noted above, the 1954 Navajo Tribal Council Resolution explicitly validated unlicensed traditional marriages performed prior to 1954. Navajo Tribal Council Res. CF-2-54, Feb. 11, 1954.

Additionally, Navajo law requires that a traditional tribal marriage must be terminated by formal divorce even if the marriage is not recorded or validated. See In the Matter of Validation of Marriage of Slowman, 1 Navajo Rptr. 142 (Navajo Ct. App. 1977);[13] In the Matter of Documenting the Marriage of Slim, 3 Navajo Rptr. 218 (Crownpoint D. Ct. 1982);[14] see also Navajo Code, tit. 9 § 407 (1993) ("No person, married by Tribal custom, who claims to have been divorced shall be free to remarry until a certificate of divorce as been issued by the Courts of the Navajo Nation."); Tribal Council Resolution CJ-3-40, July 18, 1944. To the extent that the government claims that the relationship with Esther's daughter

---

[13] Also available at: http://www.tribal-institute.org/opinions/1977.NANN.0000008.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

[14] Also available at: http://www.tribal-institute.org/opinions/1982.NANN.0000060.htm (as visited on May 3, 2005, and available in the Clerk of Court's case file).

constituted a common-law marriage extinguishing Ben and Esther's traditional

marriage, the lack of a divorce ending the original 1953 marriage defeats this

argument.

Taken as a whole, the Navajo Domestic Code takes care to maintain the

validity of prior marriages that would not necessarily meet current code

requirements for marriage.[15] In addition to longstanding Navajo common law and

current Navajo Code recognizing unlicensed or unvalidated traditional marriages

performed at times when licenses were ostensibly required,[16] current Navajo law

does not necessarily require a license.[17] Thus, the government's contention that

the Jarvisons' marriage is invalid because they did not have their marriage

---

[15] For example, in § 4 of the NNC, which detail the requirements to marry generally, both portion of the Navajo Code requiring that Navajo Nation members who wish to marry may not be from the same maternal clan or biological paternal clan, or may not be related within the third degree of affinity within certain clans specifically state that "the provisions of this subsection shall not affect the validity of any marriages legally contracted and validated under prior law." Navajo Code, tit. 9, § 4(D) and (E).

[16] Even within the portion of the Navajo Nation Code dealing with validation of marriages and granting jurisdiction to the Family Courts of the Navajo Nation and to the Peacemaker Courts, upon referral from the Family Courts, states that "[m]arriages need not be solemnized by church, state, or Navajo custom ceremony to be recognized as valid under § 3(D) of this part." Navajo Code, tit. 9, § 8 (§ 3(D) deals with traditional Navajo marriage).

[17] "Licenses are not required in order to establish a marriage under the provisions of this part," Navajo Code, tit. 9, § 5(A), and failure to return the license to the Navajo Office of Vital Records within 30 days "shall not affect the validity of any marriage." Navajo Code, tit. 9, § 7B.

21

validated or licensed fails under Navajo law. Despite the district court's failure to make specific findings of fact underpinning its determination of a valid marriage, sufficient evidence is in the record validating the Jarvisons' marriage for the purposes of the spousal testimonial privilege.

The government also conceded at oral argument, to our mind, properly so, that if the case were remanded to the district court, the Jarvisons could establish the elements of common law marriage. The government's own proffer in its motion for reconsideration establishes that Esther and Jarvison were cohabiting from 1953 to 1980, and again from 2000 onwards, including the date of the alleged abuse in 2002 and the criminal investigation in 2003. The vital records and investigative reports produced by the government show that Esther and Jarvison held themselves out as husband and wife, and Esther Jarvison testified under oath that she was Jarvison's wife. Although it is true that the burden of establishing the applicability of a privilege is on the party seeking to assert it, Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir. 1995), we conclude that standard was met here.

## III

The government invites us to create a new exception to the spousal testimonial privilege akin to that we recognized in United States v. Bahe, 128 F.3d 1440 (10th Cir. 1997). In Bahe, we recognized an exception to the marital

22

communications privilege for voluntary spousal testimony relating to child abuse within the household. Federal courts recognize two marital privileges: the first is the testimonial privilege which permits one spouse to decline to testify against the other during marriage; the second is the marital confidential communications privilege, which either spouse may assert to prevent the other from testifying to confidential communications made during marriage. See Trammel, 445 U.S. at 44-46; Bahe, 128 F.3d at 1442; see also Jaffee v. Redmond, 518 U.S. 1, 11 (1996) (recognizing justification of marital testimonial privilege as modified by Trammel because it "furthers the important public interest in marital harmony). In order to accept the government's invitation, we would be required not only to create an exception to the spousal testimonial privilege in cases of child abuse, but also to create an exception – not currently recognized by any federal court – allowing a court to compel adverse spousal testimony.

The district court in this case held that Esther and Ben Jarvison "have a valid marriage and that Esther Jarvison wishes to invoke the privilege against adverse spousal testimony, pursuant to Trammel v. United States, 445 U.S. 40 (1980)." The Court in Trammel specifically held that "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." Trammel, 445 U.S. at 53; Bahe, 128 F.3d at 1442. Although the "Federal Rules of Evidence acknowledge

23

the authority of the federal courts to continue the evolutionary development of testimonial privileges in federal criminal trials governed by the principles of the common law as they may be interpreted . . . in the light of reason and experience," Trammel, 445 U.S. at 47(internal citations and quotations omitted), we do not consider this to be the appropriate case to examine whether the holding in Trammel can or should be reexamined. Accordingly, we reject the government's request to create an new exception, and **AFFIRM**.

No. 04-2093, <u>United States v. Jarvison</u>

**ANDERSON**, Circuit Judge, dissenting:


The majority opinion holds that the district court correctly found that Esther had met her burden to prove entitlement to the spousal testimony privilege. Because I believe that the majority fails to actually put Esther to that burden, fails to acknowledge that the district court crippled the government in its effort to counter that burden by refusing to permit the government to cross-examine Esther, and minimizes the significance of Jarvison's lengthy relationship with Esther's daughter, I respectfully dissent.

The majority acknowledges that the person seeking to assert an evidentiary privilege bears the burden of establishing its applicability. <u>Motley v. Marathon Oil Co.</u>, 71 F.3d 1547, 1550 (10th Cir. 1995). However, the sum total of the relevant testimony presented by Esther, the person invoking the spousal testimony privilege in the face of the government's motion to compel that testimony, was as follows:

> THE COURT:  Okay.  When were you married?
> THE WITNESS:  June 25 – where?
> THE COURT:   No.  When?
> THE WITNESS:  June 25, 1953.
> THE COURT:  Okay.  And where were you married?
> THE WITNESS:  Coyote Canyon.
> THE COURT:   Is that on the Navajo Reservation?
> THE WITNESS:  Navajo Reservation.
> THE COURT:  By whom were you married?
> THE WITNESS:  Oh, a person, John Venson.

THE COURT: Is he a Navajo medicine man?
THE WITNESS: Yes.
THE COURT: Okay. Is that a traditional marriage under Navajo law?
THE WITNESS: Yes.

Appellant's App. at 87-90. The court then declared "Okay. That's good enough for me." Id. at 90. When the government sought to cross-examine Esther, the court responded, "No, I've heard enough. I'm not going to intrude any further on her marriage." Id. The one witness the government was permitted to introduce was unable to confirm the Navajo Tribe's view of the existence and validity of the purported marriage of Esther and Jarvison, although the district court essentially disregarded the witness's view in any event:

> [I]t doesn't make any difference, in my judgment, under this kind of procedure whether the tribe thinks they're married or not. If they think they are married, and they thought they were married by a tribal medicine man, and nobody made a record of it, that doesn't mean that they're not married.

Id. at 95.

Thus, the district court held that Esther had carried her burden of proving entitlement to the spousal privilege because she simply stated she had been married in a Navajo traditional ceremony, although no documentary evidence clearly supported the existence and validity of that marriage. The majority attempts to bolster Esther's otherwise bare-bones testimony by claiming that the evidence need only show "substantial" compliance with the requirements under

-2-

the Navajo Code for a valid traditional marriage. But Esther's testimony hardly shows even a substantial compliance—all she stated was that she had been married by a man she said was a Navajo medicine man and that she believed it was a traditional ceremony. Not a shred of evidence was presented with respect to the remaining requirements of Navajo Code, tit. 9, § 3 for establishing the performance of a traditional Navajo wedding ceremony.

Furthermore, the district court severely handicapped the government in its effort to rebut her assertion of the existence of a valid marriage when it refused to let the government cross-examine Esther. The majority concedes that "the district court should have allowed the Government to cross-examine Esther on her claim of marriage" but then states that "its failure to do so must be evaluated for prejudice after considering the totality of the evidence presented on the marriage." Maj. Op. at 5-6, n.2. While the majority notes that the government was afforded the opportunity to present a witness whose testimony was, quite simply, inconclusive on whether there was a valid marriage between Esther and Jarvison, and to present a proffer of what they believed Esther's testimony would establish, the government was not afforded the opportunity to test Esther's credibility. Since the district court had already put everyone on notice that Esther's testimony would be crucial, it was clearly prejudicial to prohibit the government from cross-examining her in order to probe her credibility.

-3-

Finally, I disagree with the majority's conclusion that the totality of the evidence presented concerning the existence of a valid marriage suffices to establish that the marriage existed. The majority summarily dismisses the fact that, after cohabiting with Esther for some twelve years, Jarvison then left Esther, began cohabiting with Esther's daughter from a previous marriage, and had four children with the daughter over a fifteen-year span of cohabitation. Esther and Jarvison's "reunion" following that lengthy relationship between Jarvison and Esther's daughter has been sporadic, at best. The majority concludes that "the lack of a divorce ending the original 1953 marriage defeats th[e] argument" that the relationship with Esther's daughter constituted a common-law marriage which extinguished any prior marriage. Maj. Op. at 20. This could lead to absurd results—an allegedly valid marriage of short duration could be followed by a thirty-year common law marriage, yet the spouse from the first marriage could claim a spousal testimonial privilege while the common-law spouse from the second relationship could not. The majority is willing to overlook the need for formalities, records, and documents when it comes to determining the creation of a marriage but strictly enforces such requirements when it comes to terminating a marriage. That fails to take account of the realities of this case. I therefore respectfully dissent.