**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 10, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROBERT LEWIS DEAR, JR.,

    Defendant - Appellant.

No. 22-1303

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:19-CR-00506-REB-1)**
_____

Jacob Rasch-Chabot, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Marissa R. Miller, Assistant United States Attorney (Cole Finegan, United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **BACHARACH**, **BRISCOE**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

In the years since his November 2015 attack on a Planned Parenthood clinic in Colorado Springs, Colorado, Robert Dear has repeatedly been found incompetent to stand trial, including by the district court in the proceedings below. But on the

government's motion, the district court ordered Dear involuntarily medicated in an attempt to restore his competency. We affirm that order, holding that the district court made sufficiently detailed factual findings and that those findings—which placed greater weight on the government's experts because of their extensive experience restoring competency and their personal experience observing and interacting with Dear—are not clearly erroneous.

## Background

According to the facts alleged in the indictment, Dear arrived at the Colorado Springs Planned Parenthood clinic armed with six rifles, five handguns, a shotgun, propane tanks, and over 500 rounds of ammunition. He immediately began shooting at a car next to his in the parking lot, killing one individual. Dear then shot at others outside the clinic, killing a second individual. From there, Dear forced his way into the building, where he continued to shoot and injure employees, patients, and others gathered in the clinic. Over the course of a five-hour stand-off with law enforcement, Dear killed one officer and injured four others.

The State of Colorado arrested Dear and initially placed him on suicide watch based on statements he made during his intake and because he refused to eat or drink. Soon after, mental-health professionals diagnosed Dear with delusional disorder, persecutory type, and the state court found Dear incompetent to stand trial. Dear remained in state custody for about four years; upon periodic reexamination,

2

psychiatrists continually found him incompetent to stand trial.[1]

In December 2019, the federal government indicted Dear on 68 counts. After Dear expressed a desire to represent himself, the government moved for a competency evaluation under 18 U.S.C. § 4241. To obtain this evaluation, Dear was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri (Springfield). There, psychiatrist Lea Ann Preston Baecht evaluated Dear and determined that although he remained incompetent due to his delusional disorder, persecutory type, he was substantially likely to be restored to competency through the administration of antipsychotics.

Based on this report, and because Dear refused to take antipsychotic medication voluntarily, the government filed a motion to involuntarily medicate Dear under *Sell v. United States*, 539 U.S. 166 (2003).[2] *Sell* provides that a district court may grant a motion for involuntary medication if the government shows that (1) "important governmental interests are at stake"; (2) "involuntary medication will significantly further those . . . interests" (meaning that medication "is substantially

---

[1] In August 2017, the state court ordered Dear involuntarily medicated in an attempt to restore him to competency. The Colorado Court of Appeals affirmed, but by that point the involuntary-medication order had expired. The state court conducted additional involuntary-medication hearings in December 2018 and February 2019, but the state court ultimately determined that changes in Dear's underlying physical health rendered involuntary medication not in Dear's best medical interests.

[2] The government can also involuntarily medicate individuals who pose a risk of harm to themselves or others under *Washington v. Harper*, 494 U.S. 210 (1990). But there is no dispute here that Dear presents no such danger "[w]hen he is in custody in a tightly regulated and highly structured prison-like environment." R. vol. 1, 42.

likely to render the defendant competent to stand trial" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel"); (3) "involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate." *Id.* at 180–81 (emphases omitted). And because of "the vital constitutional liberty interest at stake," the government must prove these prongs "by clear and convincing evidence." *United States v. Bradley*, 417 F.3d 1107, 1113–14 (10th Cir. 2005); *see also Sell*, 539 U.S. at 178 (stating that "an individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs'" (quoting *Washington*, 494 U.S. at 221)). To prove a fact by clear and convincing evidence is a heavy burden that equates to showing the fact is "highly probable." *Florida v. Georgia*, 592 U.S. 433, 438–39 (2021) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

In August 2022, the district court conducted a three-day *Sell* hearing. Both parties presented expert testimony, which we summarize here and discuss in more detail in our analysis. The government called Preston Baecht, as well as Robert Sarrazin, Springfield's chief of psychiatry, who provided the treatment plan for Dear.[3] Both had worked at Springfield for over 20 years, and both testified to successfully restoring the competency of over 70% of their patients suffering from

---

[3] The government also called cardiologist Matthew Holland, who testified that Dear had never had a heart attack and generally discussed the impacts of antipsychotic medications on individuals with cardiovascular disease.

delusional disorder. Both had also personally observed and interacted with Dear and estimated a similar, over-70% chance that antipsychotics would restore him to competency. In support, they noted that Dear did not appear to have a history of failed treatment, had previously been functioning in society, and did not appear to have any cognitive disabilities. They additionally determined that neither Dear's duration of untreated psychosis (DUP) of between 10 and 30 years nor Dear's age (in his 60s) meaningfully decreased the likelihood of Dear being restored to competency. Additionally, both Preston Baecht and Sarrazin discussed the existing scientific literature, explaining that despite its limitations, it supported their opinions.

The defense called forensic psychiatrist Richard Martinez; psychiatric pharmacist William Morton Jr.; and neuropsychologist George Woods Jr. Of these three experts, only Martinez had personally examined Dear, once in December 2015, shortly after the alleged attack, and again in February 2016. Martinez and Morton both testified that antipsychotics were unlikely to render Dear competent and discounted the scientific literature discussed by the government's experts. Woods testified that certain facets of Dear's mental illness, such as various negative symptoms and his cognitive skills, indicated that involuntary medication was unlikely to restore Dear to competency.

Two weeks after the *Sell* hearing, the district court granted the government's motion to involuntarily medicate Dear. It concluded that the government's interest in bringing Dear to trial satisfied the first *Sell* prong, particularly in light of the seriousness of the charged crimes and underlying conduct, as well as the severity of

5

the potential penalties. On the second prong, the district court found that involuntary medication would significantly further the government's interest because it was both "substantially likely to render . . . Dear competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with [Dear's] ability . . . to assist counsel in conducting a trial defense." R. vol. 1, 50. In making these factual findings, the district court placed greater weight on the government's experts, crediting their significant experience restoring competency to individuals suffering from delusional disorder and their personal observations of and interactions with Dear. On the third prong, the district court reasoned that involuntary medication was necessary because Dear consistently refused medication to treat his delusional disorder and "no alternative, less[-]intrusive treatments" existed that could provide "any real chance of achieving a restoration of competency." *Id.* And on the fourth prong, the district court concluded that involuntary medication was medically appropriate and in Dear's "best medical interest . . . in light of his psychiatric and medical condition." *Id.* The district court thus permitted the government to pursue its provided treatment plan for up to four months.

Dear then filed this appeal, and the district court stayed its order pending our ruling.[4]

**Analysis**

In an appeal from an involuntary-medication order, we review legal

---

[4] We have jurisdiction over this interlocutory appeal under the collateral-order doctrine. *See Sell*, 539 U.S. at 176–77.

conclusions de novo and factual findings for clear error. *See Bradley*, 417 F.3d at 1113–14. Under the basic clear-error standard, "[a] finding of fact is not clearly erroneous unless it is without factual support in the record, or unless the court[,] after reviewing all the evidence, is left with a definite and firm conviction that the district court erred." *United States v. Chavez*, 734 F.3d 1247, 1250 (10th Cir. 2013) (quoting *United States v. Jarvison*, 409 F.3d 1221, 1224 (10th Cir. 2005)). At the same time, the parties agree that in the involuntary-medication context, the clear-error standard incorporates the government's burden of proving the *Sell* prongs by clear and convincing evidence. *See United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1227–28 (10th Cir. 2007) (assessing involuntary-medication fact findings for clear error in light of government's clear-and-convincing burden). Additionally, when reviewing for clear error, "our role is not to re[]weigh the evidence." *United States v. Gilgert*, 314 F.3d 506, 515–16 (10th Cir. 2002) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993)); *see also Obeslo v. Great-West Life & Annuity Ins. Co.*, 6 F.4th 1135, 1148 (10th Cir. 2021) ("The district court 'has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from facts established, and resolving conflicts in the evidence.'" (quoting *Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009))).

Dear's appeal focuses exclusively on one portion of *Sell*'s second prong: the district court's finding that medication is substantially likely to restore him to competency. He first argues that the district court legally erred because it "failed to

7

engage in any meaningful analysis of the evidence" or "make sufficient findings in support of its determination." Aplt. Br. 30. Second, he asserts that the district court clearly erred in finding the government met its burden of showing, by clear and convincing evidence, that involuntary medication was substantially likely to restore him to competency. We consider each argument in turn.

On his first point, Dear contends that the district court failed to adequately engage with his evidence below and to make accompanying specific findings. Our caselaw does not provide a definitive standard for the required level of detail in an order directing involuntary medication, but we have stated that "the need for a high level of detail is plainly contemplated by the comprehensive findings *Sell* requires." *Chavez*, 734 F.3d at 1252–53. And indeed, the government does not dispute the basic principle that involuntary-medication orders must include particularized findings. For instance, we held in *Chavez* that details about specific medications and dosages were required for the court to adequately assess potential side effects under *Sell*'s second prong and medical appropriateness under *Sell*'s fourth prong. *Id.* at 1253. Here, of course, the types and dosages of medication are not at issue, but the basic principle holds: orders directing involuntary medication require at least some level of particularized findings. *Id.* at 1252–53.

Relying on two out-of-circuit cases, *United States v. Watson*, 793 F.3d 416 (4th Cir. 2015), and *United States v. Ruiz-Gaxiola*, 623 F.3d 684 (9th Cir. 2010), Dear maintains that the district court failed to conform to this general principle here. In *Watson*, the Fourth Circuit reversed an involuntary-medication order because the

8

district court focused entirely on whether the treatment plan generally worked for individuals with the defendant's disorder and failed to make "*any* finding assessing the likely success of the government's proposed treatment plan in relation to [the defendant's] particular condition and particular circumstances." 793 F.3d at 424–25 (emphasis added). Similarly, in *Ruiz-Gaxiola*, the Ninth Circuit reversed an involuntary-medication order because the district court "failed to make *any* factual findings relevant to the second prong of the *Sell* test," resting instead on the flawed and conclusory notion that because the treatment plan was designed to restore competency, it was substantially likely to do so. 623 F.3d at 696.

No similar omissions occurred here. For instance, unlike in *Watson*, the district court did not rely solely on the general efficacy of antipsychotics in restoring competency to individuals with delusional disorder; its order included details specific to Dear and his "particular condition and particular circumstances." 793 F.3d at 424–25. And unlike in *Ruiz-Gaxiola*, the district court here did not "set forth the testimony offered by each side" and then simply choose a side based only on generalized observations. 623 F.3d at 696. Instead, the district court specifically explained that although it had "considered carefully the testimony" of the defense experts, it placed greater weight on the government's experts because "the[ir] long experience . . . in competenc[y] restoration and their personal observations of and interactions with . . . Dear" gave "their opinions . . . a substantially stronger factual and clinical foundation." R. vol. 1, 44.

9

Dear does not dispute the government's experts' significant experience restoring competency or their personal interactions with him, and both are sound reasons to place greater weight on their testimony. *See Ruiz-Gaxiola*, 623 F.3d at 699–700 (noting that district court wrongly placed more weight on government's experts when record showed that defense expert "had a far superior knowledge base"). Rather, he faults the district court for not additionally explaining why it discounted the defense experts' opinions. But such rationale is implicit in the district court's statements. By emphasizing Preston Baecht's and Sarrazin's personal interactions with Dear and their decades of clinical experience with restoring competency, the district court necessarily discounted the defense experts' lack of such personal interactions and less extensive experience.

To be sure, the district court could have addressed this and other topics in more detail. For instance, even the government acknowledges that the district court's discussion of the scientific literature "was somewhat opaque." Aplee. Br. 62. And the district court could have offered *more* explanation for why it placed greater weight on the government experts' opinions and discounted the defense experts' opinions. But under the circumstances of this case, where (1) the weight placed on competing expert testimonies was dispositive to the district court's resolution of the motion, and (2) the district court clearly explained its assessment of competing expert testimonies, we conclude the district court provided sufficiently comprehensive findings. *See Chavez*, 734 F.3d at 1252–53; *cf. Ruiz-Gaxiola*, 623 F.3d at 696

10

(faulting district court for merely choosing between competing expert testimonies without explanation).

Dear next argues the district court clearly erred in finding that the proposed treatment is substantially likely to restore Dear to competency. At the outset, the government suggests that we cannot review this factual finding because it rests "in large part [on] its decision to credit the government's experts over [Dear's]" and "credibility determinations by a factfinder are 'virtually unreviewable.'" Aplee. Br. 33 (quoting *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003)). But Dear correctly points out that the government erroneously conflates credibility determinations with "the weight the district court gave the experts' opinions." Rep. Br. 6. Indeed, the district court explicitly concluded that the government's experts were "entitled to greater *weight*," not that the government's experts were more credible than the defense experts. R. vol. 1, 44 (emphasis added).

Returning to Dear's argument, he suggests that the government's expert testimonies were "exceedingly weak" on findings specific to him. Aplt. Br. 39. We continue to agree that specificity is necessary. Indeed, we have previously acknowledged that "the government cannot merely show that a proposed treatment is 'generally effective'"—instead, it "must prove that a proposed treatment plan, 'as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial.'" *United States v. Seaton*, 773 F. App'x 1013, 1020 (10th

11

Cir. 2019) (quoting *Watson*, 793 F.3d at 424).[5] But we disagree that the district court clearly erred in concluding that the government established as much by clear and convincing evidence.

Dear's appellate briefing emphasizes several factors that he maintains reduce the likelihood of being restored to competency: his duration of untreated psychosis (DUP), his age, and his cognitive abilities. Regarding DUP, the defense experts opined as a general matter that a longer DUP reduced the likelihood of restoring competency, but they offered neither specific studies nor anecdotal treatment experience to support that conclusion. Preston Baecht, on the other hand, initially explained that review of the relevant studies indicated "[in]sufficient data to suggest that [a DUP of 15–30 years] is a strong predictor" of whether someone is substantially likely to be restored to competency. R. vol. 3, 95. She additionally noted that, based on her personal experience, patients with up to 40 years of untreated psychosis had been "successfully restored to competency." *Id.* at 96. Between these two assessments, the district court did not clearly err in placing greater weight on Preston Baecht's opinion, which was more fully explained. *See Seaton*, 773 F. App'x at 1020–21 (concluding district court did not clearly err in finding substantial likelihood of restoring competency where defense expert generally opined that long DUP cut against restoration and government expert proffered personal experience to the contrary and highlighted absence of literature); *cf. United States v. Breedlove*,

---

[5] We rely on *Seaton* for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

756 F.3d 1036, 1041–42 (7th Cir. 2014) (finding no clear error where district court placed more weight on government's experts, who personally observed and treated defendant, than on defense expert's testimony that merely questioned one underlying study that government experts discussed in addition to their personal observations).

A similar dynamic played out in the testimony about Dear's age and cognitive abilities. Two defense experts suggested in passing that Dear's age could reduce the chance of restoring his competency. Preston Baecht did not disagree; she acknowledged some studies suggesting that older patients were less likely to be restored, but she noted that this could be due to various other factors, like onset of dementia. Sarrazin also explained that he would place greater weight on the age factor if Dear were 85, but he did not believe Dear's current age (in his 60s) weighed heavily against the likelihood of restoration. As to cognitive status, both Preston Baecht and Sarrazin testified that although poor cognitive condition could reduce the likelihood of restoring competency, Dear appeared to possess typical cognitive abilities. Both described him as "bright," R. vol. 3, 51, 190, and Sarrazin stated that "nothing" in his interactions with Dear indicated the existence of any "cognitive difficulties," *id.* at 191. To be sure, Woods testified for the defense that Dear did show cognitive symptoms. But the district court did not clearly err in discounting this testimony because unlike Preston Baecht and Sarrazin, Woods never personally interacted with Dear. Indeed, both Preston Baecht and Sarrazin questioned Woods's opinion by citing their personal experiences with Dear. So, on these points as well, the district court did not clearly err in placing greater weight on the government's

13

experts, who did not view Dear's age or cognitive abilities as meaningfully reducing the substantial likelihood that medication would restore his competency. *See Seaton*, 773 F. App'x at 1020 (finding no clear error in district court's finding on substantial likelihood of restored competency where government's experts "persuasively rebutted" defense expert); *cf. Ruiz-Gaxiola*, 623 F.3d at 699–701 (ruling that district court clearly erred in relying on "generalized statements and unsupported assertions of the government's experts, when contrasted with the specific and authoritative rebuttal evidence presented by the defense").

Dear also devotes a significant portion of his clear-error briefing to what he views as the insufficiency of the scientific literature regarding competency restoration for individuals with delusional disorder. In so doing, he highlights two points that the government's experts did not meaningfully disagree with: (1) historically, psychiatrists believed that delusional disorder could not be effectively treated with antipsychotics, and (2) more recent studies questioning that historical view suffer from certain weaknesses. But Dear overlooks Preston Baecht's explanation that the historical evidence also suffered from weaknesses, such as inadequately short trial periods and lack of a specific focus on competency restoration. And in any event, although the district court's discussion of the scientific literature was nonspecific and arguably inconsistent,[6] the court did not base its

---

[6] The district court noted that "[s]ome published studies" supported the government's experts' estimation as to the likelihood of restoration, that "some published studies reflect[ed] a lower competency restoration rate," and that "some

factual findings on any study. Instead, it relied on the personal experience of the government's experts in restoring competency generally and interacting with Dear specifically. Under these circumstances, we decline to find clear error based on the district court's discussion of the scientific literature. *See Breedlove*, 756 F.3d at 1042 (rejecting argument that district court clearly erred in relying on expert testimony about somewhat flawed scientific research in part because experts' opinions were also based on personal observations of defendant); *United States v. Fieste*, 84 F.4th 713, 727–28 (7th Cir. 2023) (rejecting argument that district court clearly erred by relying on generalized statistics where government's expert testified based on both scientific literature and personal examination); *cf. Watson*, 793 F.3d at 426 (reversing involuntary-medication order in part because expert's cited studies provided "some evidence that antipsychotic medication may be effective against [d]elusional [d]isorder in general" but were in no way tied to specific defendant).

In sum, given the district court's explanation for placing greater weight on the testimony of the government's experts, who specifically rebutted the views of the defense experts, we are not left with the "definite and firm conviction that the district court erred" in determining that involuntary medication was substantially likely to restore Dear to competency. *Chavez*, 734 F.3d at 1250 (quoting *Jarvison*, 409 F.3d at 1224).

---

published studies" were less persuasive due to having small sample sizes, being too short, or involving noncompliant patients. R. vol. 1, 43.

## Conclusion

The district court provided sufficiently particularized findings and did not clearly err in placing greater weight on the government's expert testimony to conclude that involuntary medication is substantially likely to restore Dear to competency. Accordingly, we affirm the district court's order granting the government's motion to involuntarily medicate Dear in an effort to restore his competency. And as a final matter, we grant the government's unopposed motion to file the second supplemental volume of the record under seal. *See United States v. Dillard*, 795 F.3d 1191, 1205–06 (10th Cir. 2015) (noting that "the privacy interest inherent in personal medical information can overcome the presumption of public access").