PHILLIPS, Circuit Judge.
The United States is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction (the Convention), Oct. 25, 1980, T.I.A.S. No. 11,670.[1] The Convention's purpose is *1141 to facilitate custody disputes "promptly and exclusively, in the place where the child habitually resides." Chafin v. Chafin , 568 U.S. 165, 180, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013) (Ginsburg, J., concurring). At issue in this case is the district court's determination concerning the location of the children's habitual residence. We identify no error in the court's determination, and, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.
BACKGROUND
I. The Watts Family Moves to Australia.
Shane Watts is a dual citizen of Australia and the United States. Carrie Watts is a citizen of the United States. In 2005, Shane and Carrie married in Park City, Utah. From December 2006 to June 2016, the couple lived in North Carolina, where they reared their three children-also dual citizens of Australia and the United States-and ran an international dirt-bike-racing school: DirtWise.
In March 2016, the couple learned that their middle child would need specialized medical attention possibly including expensive palate-extension surgery. The family decided to move to Australia to benefit from that country's universal-healthcare system. The couple intended to live in Australia until completion of their son's medical treatment. They estimated this would take about two to two-and-a-half years.
In spring 2016, the family began preparing for the move. Shane and Carrie rented out their home in North Carolina and temporarily moved the family into Carrie's parents' house in Utah. The family lived at this house in Utah from June 2016 to September 2016. While living at Carrie's parents' house, the family traveled around the western United States, in part "to evaluate places where they might choose to live when they returned from Australia." Appellant's App. at 307. During this time, "the parties had many conversations about their intentions to live in Australia only long enough to obtain [their son's] healthcare." Id.
In September 2016, the family moved to Australia. They rented a home in Shane's hometown of Maffra, Victoria and shipped many of their belongings to Australia.[2] Carrie had also applied for, and was later granted, a temporary visa enabling her to remain in Australia for 12 months. In October 2016, Shane and Carrie enrolled their children in school in Australia.
After the rental home proved too small, Shane and Carrie bought a house near Shane's parents' home. Carrie oversaw the renovation of the new home and furnished the home with used furniture that she bought and refurbished. In March 2017, the family moved into this home.
The move to Australia placed additional stress on Shane and Carrie's already-strained marriage. Carrie had developed second thoughts about the move and questioned the sustainability of the stint in Australia. Shane continued to travel overseas for work and, while doing so, rarely spoke with Carrie. Concerned that she would be unable to work if she and Shane later divorced, Carrie applied for a permanent visa.
In April 2017, Carrie called a family meeting, attended by Shane's parents and Carrie's mother. At the meeting's end, everyone agreed that Shane and Carrie needed to remain together so that their child could continue to receive necessary *1142 medical care, and so that Carrie could get her permanent visa.
Despite their professed resolve to remain together, Shane and Carrie's relationship continued to deteriorate. From April 20 to May 20, 2017 and again from May 30 to July 13, 2017, Shane traveled to the United States to teach DirtWise classes. The couple barely spoke while Shane was away, and Carrie noticed "irregularities" in their shared bank accounts. Id. at 309. One morning, Carrie discovered that she had been locked out of all their shared accounts and that Shane had cancelled, or set zero-dollar limits on, their joint credit cards. After learning this, Carrie retained legal representation in Australia and met with a bank representative who helped her secure $29,000 from one of the joint accounts and another $16,000 from other accounts that the parties owned.
This marked the beginning of the end. About July 13, 2017, Shane returned to Australia, and on July 26, 2017, he tried one last time to persuade Carrie to work on the marriage. When she declined, Shane notified the Australian immigration authorities that they had separated, and he withdrew his sponsorship of Carrie's permanent-visa application. Carrie obtained an "intervention order"-the Australian equivalent of a protection order-against Shane. Id. at 310. In the order application, Carrie alleged that Shane had emotionally and financially abused her. But as the district court found, "[t]here were no allegations of physical harm or threats to Carrie or the children, and the parties have stipulated ... that Shane has never physically abused any of the children." Id. at 310-11.
On August 17, 2017, about three days after learning that Shane had withdrawn his sponsorship of her permanent-visa application, Carrie took the children and flew to Utah. She did not tell Shane beforehand, and she lied to customs agents that she was traveling to the United States for a short visit. As the district court found,
[before] removing the children and returning to the United States, the parties never had a shared mutual intent to make Victoria, Australia the habitual residence of the children. At no time did Carrie and Shane mutually agree to change their initial plan to be in Australia only long enough for [their son] to receive his medical care-after which they would return to the United States to raise the children.
Id. at 311. Carrie and the children have remained in Utah since. In total, the family lived in Australia for just over eleven months.[3]
II. Shane Petitions for the Children's Return to Australia.
Shane petitioned a federal court in Utah for the return of the children. In his petition, Shane claimed that Carrie had wrongfully removed the children from their "habitual residence"-i.e. , Victoria, Australia. Accordingly, Shane argued that the Hague Convention compelled the court to order the children's return to Australia. The district court denied Shane relief and dismissed the petition.
In its order, the district court concluded that Shane had failed to prove by a preponderance that Australia was the children's habitual residence. The district court noted that courts traditionally rely on two factors when determining a child's habitual residence under the Convention. The first factor is the child's acclimatization to the country that the petitioner *1143 claims is the habitual residence. As the district court framed it, when determining acclimatization, a court must resolve whether the "children have become so rooted in the new country that" removal "is tantamount to taking the child[ren] out of the family and social environment in which [their] life has developed." Id. at 317 (citing Mertens v. Kleinsorge-Mertens , 157 F. Supp. 3d 1092, 1105 (D.N.M. 2015) ). The second factor is the parents' last shared intent. To that end, the parents must evince "a degree of settled purpose" or "a sufficient degree of continuity to be properly described as settled." Id . at 316-17 (citing Kanth v. Kanth , No. CIV 99-4246, 2000 WL 1644099, at *1 (10th Cir. Nov. 2, 2000) ). The district court held that under both factors, Shane had failed to show by a preponderance of the evidence that Australia was the children's habitual residence.
Regarding acclimatization, the district court acknowledged that the children had attended school, made friends, explored Australia, and "interacted somewhat" with Shane's family. Id. at 317. But the court also noted that the children had known that they would be in Australia for a limited time, that they had lived in two different houses while in Australia, and that they had "never considered Australia home." Id. Based on these facts, the court concluded that Shane had failed to prove by a preponderance of the evidence that the children had acclimatized to Australia.
Additionally, the court concluded that Shane and Carrie had never shared an intent to settle in Australia. The court found that Shane and Carrie had moved to Australia for one reason-their child's expensive orthodontic needs. The couple kept their home in North Carolina and left many of the family's sentimental items in Utah. Moreover, the couple left their bank accounts open in the United States, and Shane continued to operate DirtWise primarily in North America.[4] From this, the court concluded that the couple had never shared an intent to make Australia their children's habitual residence. Accordingly, the court dismissed Shane's petition, and Shane timely appealed.
DISCUSSION
To award relief under the Hague Convention, a district court must find that a child's removal from a country was "wrongful." Shealy v. Shealy , 295 F.3d 1117, 1121-22 (10th Cir. 2002). To that end, a petitioner seeking relief under the Convention "must show that: (1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention." Id. at 1122. Here, the district court concluded that Shane had failed at step one-i.e. , that he had not proved that Australia was the children's habitual residence.
On appeal, Shane attacks the district court's ruling on several fronts. All of Shane's challenges claim legal error. Thus, we review de novo Shane's claims that the district court applied the wrong legal standard when it determined that Australia was not the children's habitual residence. See id. at 1121 ("In an action pursuant to ICARA and the Hague Convention, we *1144 review the district court's findings of fact for clear error and its conclusions regarding principles of domestic, foreign, and international law de novo .").[5]
I. The District Court Did Not Require Permanency as a Prerequisite to a Habitual-Residency Finding.
Shane first argues that the district court erred by conflating the habitual-residence standard with the domicile standard that traditionally governs jurisdiction over American child-custody disputes.[6] Specifically, Shane claims that, as a prerequisite for habitual residency, the district court required that he and Carrie have shared an intent to stay in Australia "permanently or indefinitely." Appellant's Op. Br. at 29. But a review of the district court's order defeats Shane's claim.
In deciding this case, the district court relied in part on our unpublished opinion in Kanth , 2000 WL 1644099, at *1. In Kanth we observed that the term "habitual residence" is not defined by the Hague Convention or the U.S. Code. Id. We also observed that the term should not be interpreted technically or restrictively. Id. Instead, a district court should examine the "specific facts and circumstances" presented in each case to determine if there is a "settled purpose," or "a sufficient degree of continuity to be properly described as settled." Id. (quoting Feder v. Evans-Feder , 63 F.3d 217, 223 (3d Cir. 1995) ). So we agree with Shane that a family need not intend to remain in a given location indefinitely before establishing habitual residency there. The length of an intended stay is just one factor to consider when determining whether the petitioner has proven "a sufficient degree of continuity to be properly described as settled." Id.
The problem with Shane's argument is that the district court did not require permanency. In its order dismissing Shane's petition, the district court cited our unpublished order in Kanth and recognized that permanency is not necessary to establish habitual residency. The district court considered the "specific facts and circumstances" surrounding the Watts' move to Australia and, in doing so, looked to the length of the family's intended stay as one factor among many. Appellant's App. at 316 (citing Kanth , 2000 WL 1644099, at *1 ). The court noted that the family intended to remain in Australia for "a highly *1145 specific purpose which by its nature had a limited duration," and that "[t]he couple maintained a home in North Carolina; stored many household, holiday, and sentimental possessions in Utah"; and maintained "U.S. financial ties." Id. at 317-18. Additionally, the court noted that "Shane maintained his company, DirtWise, primarily operating in North America." Id. Considering these facts together, the court concluded that Australia was not the children's habitual residence. Despite Shane's claim to the contrary, the court did not require permanency as a necessary component of proving habitual residency. Accordingly, the court did not err in this regard.
II. The District Court Did Not Ignore Shane and Carrie's Present, Shared Intent.
Next, Shane argues that the district court erred by failing to consider his and Carrie's "present, shared intentions regarding their child[ren]'s presence" in Australia. Appellant's Op. Br. at 33-34 (emphasis omitted). Shane's argument has two parts. First, Shane argues "[a] child's habitual residence is generally the last place that the child lived per the parents' most recent agreement." Id. at 33. Thus, Shane claims that Australia was the children's habitual residence because Shane and Carrie's last shared intent was to live in Australia. But a court must consider all the facts and circumstances concerning the couple's intended stay in the country. Here, the court found that the shared intent "was to remain in Australia for a highly specific purpose which by its nature had a limited duration." Appellant's App. at 218. The court properly considered all the factors embedded in Shane and Carrie's decision to live in Australia. See Whiting v. Krassner , 391 F.3d 540, 546 (3d Cir. 2004) ("The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case.").
Second, Shane cites cases in which courts have found that a shared intent to remain in a location for two to four years was sufficient to sustain a habitual-residence finding. Appellant's Op. Br. at 35 (citing Whiting , 391 F.3d at 551, and Toren v. Toren, 26 F. Supp. 2d 240, 243-44 (D. Mass. 1998) ). Shane then stresses that he and Carrie had intended to stay in Australia until their child had received all needed medical care, which could be up to three-and-a-half years. We understand Shane to argue that this timeline alone establishes habitual residency.
As noted above, when determining habitual residency, courts must consider all the facts and circumstances surrounding the family's life in a given location. Under some facts and circumstances, two years may suffice to establish habitual residency. See Whiting , 391 F.3d at 551. But the intended length of a stay, on its own, does not necessarily demonstrate habitual residence. Instead, a court should consider all the circumstances surrounding a family's intent to remain in a location and determine if there is a "sufficient degree of continuity to be properly described as settled." Kanth , 2000 WL 1644099, at *1 (quoting Feder , 63 F.3d at 223 ). The district court properly conducted this analysis and, in doing so, committed no legal error.
III. The District Court Did Not Misconstrue Kanth .
Shane next argues that the district court has run afoul of Kanth , 2000 WL 1644099. In Kanth , as here, we reviewed a district court's habitual-residence determination. Id. at *1. In doing so, we noted that "[a]lthough it is the child's habitual residence that the court must determine, in the case of a young child the conduct, intentions, and agreements of the *1146 parents during the time preceding the abduction are important factors to be considered." Id. The children in Kanth were three and six years old when they were taken from Australia by their mother. Id . at *1 n.1. In contrast, Shane and Carrie's children were 7, 10, and 12 years old when Carrie removed them from Australia. Shane argues that Kanth 's emphasis on parental intent does not apply here, because the Watts children are older. But the record reveals that the court did not, as Shane argues, place "heavy importance on parental intent over child acclimatization." Appellant's Op. Br. at 37. Instead, the district court considered both factors independently and equally.
In its order dismissing Shane's petition, the court found that "under the totality of the evidence before it ... the children did not acclimatize to Australia." Appellant's App. at 317. The court considered acclimatization from the children's perspective and relied on evidence demonstrating that the children's family and social environment had not sufficiently developed in Australia.[7] Additionally, the court concluded that "even if the children had acclimatized," Shane and Carrie's last shared intent was to stay in Australia "only for a limited time." Id. at 318, 322. The court thus considered both acclimatization and parental intent as independent factors, and we disagree with Shane that it weighed one more heavily than the other.[8] The court did not err in its weighing of the factors.
IV. The District Court Applied the Correct Acclimatization Standard.
Shane argues that the district court legally erred by not fully crediting how long the children had been in Australia. To that end, Shane argues that "nearly one year spent living in a country in which the children believed they would spend at least a few more years of their lives is indeed a sufficient amount of time to acclimatize." Appellant's Op. Br. at 40. In support, Shane claims that "the plain text of the Hague Convention acknowledges that one year is long enough for a child to become settled in a new environment." Id. at 41-42 (citing Hague Convention, art. 12). While Shane's legal foundation is firm, his conclusion is unstable.
Indeed, a child may acclimatize to a new location in a year; however, it is equally true that a year might be an insufficient amount of time for acclimatization. We acknowledge that courts have found a child to have acclimatized in as little as six months. See Feder , 63 F.3d at 224. But six months in a given location certainly does not always prove that a child has acclimatized. See Mozes v. Mozes , 239 F.3d 1067, 1083 (9th Cir. 2001).
To keep a court's habitual-residence determination free from technical restrictions, we will not read into the term "habitual residence" any conclusive time frame. Though the length of time a child lives somewhere matters in determining *1147 whether the child has acclimatized there, it is merely one factor among many. Thus, the court applied the correct legal standard by considering the totality of the circumstances-not just the amount of time spent in Australia-when determining whether the children had acclimatized.
V. The District Court Did Not Need to Consider Article 31(a) of the Convention.
Shane's last claim of legal error is that the district court failed to determine which state-Utah or North Carolina-was the children's habitual residence. Shane relies on Article 31(a) of the Convention and claims that after the court determined that Australia was not the children's habitual residence, the court needed to decide which state within the United States was the children's habitual residence.[9] We reject this argument.
As noted, to obtain relief under the Convention, a petitioner must establish that "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention." Shealy , 295 F.3d at 1121-22. Article 31 applies to the second and third elements as it states:
In relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units -
(a) Any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State;
(b) Any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in the State where the child habitually resides.
Hague Convention, art. 31. When, as here, the petitioner fails to establish habitual residence, Article 31 is not implicated. See Feder , 63 F.3d at 221-22, n.8 ("If a child's habitual residence is a State which has more than one territorial unit, the custody rights laws of the territorial unit apply. ... In the United States, the law in force in the state in which the child was habitually resident ... would apply to determine whether a removal or retention was wrongful." (citing Hague Convention, art. 31)).
Shane argues that the "children's prior habitual residence before moving to Victoria, Australia was North Carolina, not Utah", because "the parents never agreed that the children would live in Utah," and that Carrie generally planned to relocate only somewhere in the United States. Appellant's Op. Br. at 45. Shane notes that "the only state that the children were settled and habitually resident in prior to moving to Victoria, Australia was North Carolina" and that "the children had only ever visited their maternal grandparents in Utah for short periods of time." Id. at 44-45. True as this may be, it has no bearing on his claim.
The Convention does not require a district court to determine where a child *1148 habitually resides. Instead, the Convention requires a district court to determine whether the child habitually resides in the location that the petitioner claims. If the child habitually resides there, the Convention demands that the court determine whether the child's removal from that location was wrongful. See Shealy , 295 F.3d at 1121-22. Here, the court found that the children did not habitually reside in Australia, so it matters not in which state in the United States the children now reside.[10]
In any event, the district court had no occasion to apply Article 31 here, because it found that Shane failed at the first step-that is, he did not show that Australia was the children's habitual residence. Cf. Shalit v. Coppe , 182 F.3d 1124, 1128-29 (9th Cir. 1999) (applying the choice-of-law provisions only after finding that the children's habitual residence was where the petitioner claimed). And because Shane failed to establish the first element of his claim, the district court correctly ended its analysis there.
CONCLUSION
For the foregoing reasons, we affirm the district court's order dismissing Shane's petition.

Congress implemented the Convention through the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001, et seq .

But as the district court found, the family also left several sentimental items behind in Utah. Items left behind included "bikes, holiday decorations, and sentimental items such as family 'memory boxes' and ashes of cremated pets." Appellant's App. at 307.

On September 7, 2017, Shane filed a lawsuit in Australia seeking child custody and visitation. That litigation was still ongoing at the time the district court denied Shane's petition.

Regarding finances, the district court found that though the parties had moved their banking from a local North Carolina bank to Wells Fargo "to make international banking more convenient," they kept open "existing bank accounts and credit card accounts in the United States." Appellant's App. at 307. The couple left the "DirtWise operating account open in North Carolina" and only made a temporary "$200,000 fund investment in Australia in connection with the move." Id.

The Supreme Court recently granted a writ of certiorari in Monasky v. Taglieri , 907 F.3d 404 (6th Cir. 2018), cert. granted , --- U.S. ----, 139 S.Ct. 2691, 204 L.Ed.2d 1089 (2019). At issue in Monasky is the appropriate standard of review for a claim that a district court has misapplied uncontested facts to an uncontested legal standard. Id. , petition for cert. filed , 2019 WL 261732, at *i, --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ---- (Jan. 15, 2019) (18-0935).
Monasky likely will not impact this case. After all, Shane does not argue that the district court erred in its application of the facts to an agreed-upon legal standard, but, instead, argues that the district court applied the wrong legal standard. This court, and the Supreme Court, have been clear that such legal questions are subject to de novo review. See Pierce v. Underwood , 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ; Shealy , 295 F.3d at 1121.

At oral argument, we asked how the parties could agree to jurisdiction in Australia for custody proceedings while simultaneously debating that Australia was the children's habitual residence. As Shane's first argument demonstrates, the answer to this inquiry is simple: The Convention's habitual-residency standard could of course differ from the standard for determining jurisdiction over child-custody disputes. Guzzo v. Cristofano , 719 F.3d 100, 103 (2d Cir. 2013) (acknowledging that the Convention's use of the term "habitual residence" is "not equivalent to the American legal concept of 'domicile,' which relies principally on intent"). Thus, a court could have jurisdiction over a child-custody dispute even though the court does not sit in the child's habitual residence.

The court interviewed the two older children in camera but gave little weight to their spoken views because their answers "appeared rehearsed and possibly coached." Appellant's App. at 301-04. But the court did credit Carrie's testimony that the children did not consider Australia home.

Shane claims that there is a "nuanced" circuit split regarding the weight to assign the two relevant factors: acclimatization and shared parental intent. Appellant's Op. Br. at 49. Shane argues that this court should adopt the approach which emphasizes acclimatization from the child's perspective over the parents' shared intent. To the extent that there is such a circuit split, this case can be resolved without choosing a side. The district court considered each factor independently and held that under either one Shane had failed to prove by a preponderance of the evidence that Australia was the children's habitual residence. Thus, it is immaterial which factor-if either-carries more weight.

Shane also argues that the district court's dismissal of his petition contravenes the Convention's underlying goals. Shane claims that the district court "condoned [Carrie's] wrongful actions and rewarded her scheme of lying to the Australian authorities and removing the children in violation of Shane's custody rights." Appellant's Op. Br. at 48-49. This is not true. The court did not condone Carrie's conduct but instead found that the Convention did not provide Shane relief. The Convention applies only when a child is removed from his or her habitual residence, and Shane has failed to prove that Australia was the children's habitual residence. By the Convention's own terms, it did not apply to Shane.

We agree with Carrie that requiring her to prove which state in the United States was the children's habitual residence would improperly shift the burden of proof from Shane to her. Shane bears the burden to prove that the children's habitual residence was Australia, but Carrie does not bear the burden to prove that the children habitually reside in the United States.