FILED
**United States Court of Appeals
Tenth Circuit**

**November 20, 2020**

**Christopher M. Wolpert
Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KENNETH STEVEN POPE, acting on
behalf of infant children, T.H.L-P and
J.R.L-P,

     Petitioner - Appellant,

v.

LAUREN ELAINE LUNDAY,

     Respondent - Appellee.

No. 20-6003
(D.C. No. 5:19-CV-01122-PRW)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **EBEL**, and **McHUGH**, Circuit Judges.
_____

Kenneth Pope appeals from the district court's denial of his petition under the

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25,

1980, T.I.A.S. No. 11,670 (the Convention), and its implementing legislation, the

International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 (ICARA).

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law
of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Mr. Pope is a United States citizen who lives permanently in Brazil. He and Lauren Lunday, also a United States citizen, met in college in Oklahoma and entered into an on-again, off-again romantic relationship. The relationship rekindled in 2014, and Ms. Lunday joined Mr. Pope in Brazil in July 2018. The couple obtained a public deed of stable union in Brazil in December 2018.[1]

In March 2019, Ms. Lunday became pregnant with twins. When she was 19-20 weeks' pregnant, she returned to Oklahoma. Mr. Pope understood her trip to the United States was for only a few weeks, to attend social and business events. But Ms. Lunday took her pet cat back with her, and she did not return to Brazil. In the following months the couple's communications were strained. The infants were born in Oklahoma in November 2019. Since then they have resided there with Ms. Lunday.

Mr. Pope filed his petition days after the birth, and argues that Ms. Lunday has wrongfully retained the twins in Oklahoma from the moment they were born. Focusing on the threshold question of whether the infants habitually resided in Brazil, the district court decided the petition without holding an evidentiary hearing.

---

[1] A Brazilian public deed of stable union recognizes a couple as a family entity. Beyond the documented stable union, the couple's legal relationship is unclear. Mr. Pope asserts that the two married in a ceremony in Tulum, Mexico, in November 2018. Ms. Lunday acknowledges they "participated in a ceremony and celebration of their relationship with their family and friends," but denies that the ceremony was a legal marriage ceremony. Resp. Br. at 2. The issue before us, however, does not turn on the precise legal status of the parties' relationship.

2

It first expressed doubt that newborn infants are capable of having a habitual residence. But even assuming that a newborn can have a habitual residence, it held that Mr. Pope had failed to establish that the infants' habitual residence was in Brazil. It therefore held that Ms. Lunday had not wrongfully retained the infants, and it denied Mr. Pope's petition.

## DISCUSSION

The Convention prohibits the wrongful removal or retention of a child. *See* Convention, art. 1, 3. To establish a wrongful removal or retention, Mr. Pope must show by a preponderance of the evidence that "(1) the child[ren] [were] habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of [his] rights under the laws of that state; and (3) [he] was exercising those rights at the time of removal or retention." *Watts v. Watts*, 935 F.3d 1138, 1143 (10th Cir. 2019) (internal quotation marks omitted); *see* 22 U.S.C. § 9003(e)(1). As in *Watts*, "[a]t issue in this case is the district court's determination concerning the location of the children's habitual residence." *Watts*, 935 F.3d at 1141.

Mr. Pope does not claim that Ms. Lunday wrongfully *removed* the infants when she left Brazil while pregnant. Rather, he claims that she wrongfully *retained* the infants away from Brazil, starting at their births. He argues that the district court erred in concluding that a newborn cannot have a habitual residence and that Brazil

was not the infants' habitual residence.[2]  He further asserts that the district court denied him due process by deciding the petition without holding an evidentiary hearing.

## I.     The Habitual-Residence Determination

The district court ruled without the benefit of the Supreme Court's recent discussion of "habitual residence" in *Monasky v. Taglieri*, 140 S. Ct. 719 (2020).  In *Monasky* the Court held that a habitual-residence determination is a fact-intensive question to be reviewed only for clear error.  *See id.* at 730.  We will reverse for clear error "only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."  *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1263 (10th Cir. 2008) (internal quotation marks omitted).

*Monasky* provides some guidance concerning whether a newborn might have a habitual residence.  *See* 140 S. Ct. at 728 (if parents' actual agreement on where to raise their child were necessary to establish a habitual residence, that "would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected" (internal quotation marks omitted)).  We need not decide that issue, however, because "[t]he Convention does not require a

_____

[2] We disagree with Mr. Pope's view that the district court held that a newborn child cannot have a habitual residence at birth.  All the court said was that it was "not convinced that a newborn is capable, at the moment of birth, of having a place of 'habitual residence,' as that term is used in the Convention."  Aplt. App. Vol. III at 563.

4

district court to determine *where* a child habitually resides. Instead, the Convention requires a district court to determine *whether* the child habitually resides in the location that the petitioner claims." *Watts*, 935 F.3d at 1147-48. And we cannot conclude that the district court clearly erred in determining that Brazil was not the infants' habitual residence.

"The Hague Convention does not define the term 'habitual residence.'" *Monasky*, 140 S. Ct. at 726. "A child 'resides' where she lives. Her residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory." *Id.* (citation omitted). "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* "[L]ocating a child's home is a fact-driven inquiry," in which "courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 727 (internal quotation marks omitted). In *Monasky* the Court rejected any "categorical requirements for establishing a child's habitual residence," *id.* at 728, and held that "[n]o single fact . . . is dispositive across all cases," *id.* at 727. Ultimately, the question is, "Was the child at home in the particular country at issue?" *Id.* at 730.

Mr. Pope argues that he and Ms. Lunday had established their home in Brazil and had agreed to raise the infants there. In support of the conclusion that Ms. Lunday had relocated to Brazil, he points out that the couple held a ceremony in Mexico and obtained the public deed of stable union in Brazil; Ms. Lunday had begun the process of becoming licensed to practice her profession of oral and

5

maxillofacial surgery in Brazil; she had obtained a Brazilian social security card and health insurance; she had begun taking Portuguese lessons; and the couple had purchased and begun renovating a home in Brazil. He further asserts that once the couple agreed to raise the infants in Brazil, Ms. Lunday could not unilaterally change that agreement.

Mr. Pope's position boils down to an assertion that the court must rule that a newborn's habitual residence is wherever the parents last agreed it would be. But *Monasky* rejected the proposition that any particular circumstance controls. *See* 140 S. Ct. at 728-29. It specifically held that although "the intentions and circumstances of caregiving parents are relevant considerations," *id.* at 727, nothing requires an actual agreement between the parties, *see id.* at 728.

Ms. Lunday emphasizes that the infants have never even been to Brazil. She argues that it is only the rare case, with circumstances not present here, in which a court has held that an infant is habitually resident in a country in which he or she has never been. But as with actual agreement, *Monasky* states that "[a]n infant's mere physical presence . . . is not a dispositive indicator of an infant's habitual residence." *Id.* at 729 (internal quotation marks omitted).

"The bottom line: There are no categorical requirements for establishing a child's habitual residence[.]" *Id.* at 728. "[A] wide range of facts . . . , including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id.* at 729; *see also Watts*, 935 F.3d at 1145 ("[W]hen

6

determining habitual residency, courts must consider all the facts and circumstances surrounding the family's life in a given location.").

The district court's ruling was consistent with *Monasky*'s "totality of the circumstances" approach. 140 S. Ct. at 723; *see also id.* at 729. Rather than considering any factor to be dispositive, the court considered a wide range of factors. It noted that the infants were born in the United States; that both parents and children were United States citizens; and that Ms. Lunday had moved back to the United States while pregnant and the infants had not "spent a moment of their lives in Brazil" since birth. Aplt. App. Vol. III at 563-64. It discussed Mr. Pope's actual-agreement argument but found that after their birth, "even granting Pope's factual allegations every benefit of the doubt[,] there was never shared parental intent with respect to the children." *Id.* at 564. It rejected Mr. Pope's contention that "Lunday can never withdraw from the pre-birth agreement she allegedly had with Pope [and] is bound to that agreement forever unless she comes to a new agreement with Pope," *id.* at 565, noting that "Pope's position ignores everything that has happened since the alleged *in utero* agreement," *id.* at 566. And given the conflict between the parties since Ms. Lunday returned to the United States, the court stated, "'shared parental intent' that existed at 19 to 20 weeks *in utero* is not sufficient to override every other undisputed fact in this case, all of which point in one direction: away from Brazil as the place of habitual residence." *Id.*

Having reviewed the briefs, the record, and the law, we cannot conclude that the district court's findings are clearly erroneous. The court's findings have support

7

in the record, and we are not left with a definite and firm conviction of a mistake. We therefore affirm the district court's determinations that the infants were not habitual residents of Brazil and, accordingly, that Ms. Lunday did not wrongfully retain them in Oklahoma.

## II. Evidentiary Hearing

Mr. Pope further argues that he was denied due process when the district court denied his petition without holding an evidentiary hearing. But "a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA." *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013). "[N]either the Convention nor ICARA, nor any other law of which we are aware including the Due Process Clause of the Fifth Amendment, requires that discovery be allowed or that an evidentiary hearing be conducted as a matter of right in cases arising under the Convention." *Id.* (internal quotation marks omitted). Rather, "a meaningful opportunity to be heard . . . is all due process requires in the context of a Hague Convention petition." *Id.* at 932.

The district court afforded Mr. Pope a meaningful opportunity to be heard. The district court based its analysis on the facts alleged in the petition, assuming the truth of those allegations.[3] Most importantly, it accepted as true Mr. Pope's

---

[3] Mr. Pope disputes whether the district court actually assumed facts in his favor. For example, he challenges the district court's statement that "'after leaving Brazil for the United States, Lunday ended her relationship with Pope,'" and he states that "the district court could only presume that Lunday intended to stay in the United States." Aplt. Opening Br. at 20 (quoting Aplt. App. Vol. III at 566). But the very existence of this litigation supports those conclusions.

"contention that he and Lunday had an *in utero*, pre-estrangement agreement that they would reside in Brazil with their future children," Aplt. App. Vol. III at 559, the linchpin of his argument. Moreover, Mr. Pope attached numerous exhibits to his petition, and he fails to identify any specific, additional evidence that he would have presented at a hearing. In these circumstances, the district court acted within its discretion in resolving the petition without holding an evidentiary hearing.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Harris L Hartz
Circuit Judge