FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 16, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

VIOLETA DUMITRASCU, on behalf of
A.M.B.D.,

    Plaintiff - Appellee,

v.

ALIN DUMITRASCU,

    Defendant - Appellant.

No. 21-1341
(D.C. No. 1:21-CV-01813-PAB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

This appeal arises from an international custody dispute between Alin

Dumitrascu and Violeta Dumitrascu regarding their minor child, A.M.B.D.  The

district court found that Alin wrongfully retained A.M.B.D. in the United States and

ordered A.M.B.D.'s return to Romania under the Hague Convention on the Civil

Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343

U.N.T.S. 89 (Hague Convention), and its implementing legislation, the International

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011. Alin challenges the

district court's threshold finding that A.M.B.D. habitually resided in Romania.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

Alin and Violeta are both Romanian by birth and have family in Romania.

Alin moved to the United States in 2006 and became a United States citizen. Violeta

is a Romanian citizen.

The two met online in 2007 and married in Romania in 2015. They then

moved to Colorado in 2016, and Alin successfully sponsored Violeta's application

for a green card.

Violeta later became pregnant with A.M.B.D. The couple decided to travel to

Romania for her birth in part to avoid hospital fees in the United States. They

traveled to Romania in early August 2019, where they stayed with Alin's father;

though at that point they "intended to return to the United States at some point to

raise the child." Aplt. App., vol. 2 at 20. Violeta gave birth to A.M.B.D. on

September 4, 2019, and the couple lived in Romania for about ten months after

A.M.B.D.'s birth.

During that time, their "plan for the future diverged." *Id.* "When A.M.B.D.

was five weeks old, [Violeta] got a job [in Romania] because someone had to earn

money and [Alin] did not want to work in Romania." *Id.* Violeta's green card also

expired, the United States denied her application for an extension, and she developed

reservations about returning to the United States. "She therefore made plans for the

2

family to live in Romania." *Id.* at 21.  As part of these plans, she applied for "the First House program, a Romanian program to assist young families in buying their first home." *Id.*

Alin intended for the family to return to the United States.  He got Violeta's permission to travel to the United States with A.M.B.D. so he could obtain a social security card for the child.  "He also planned to work on getting [Violeta] a green card, to bring her over to the United States, and to earn money through a job." *Id.* at 22.  To facilitate this trip, Violeta signed an affidavit that stated:  "I agree and consent[] that [A.M.B.D. can] travel to the United States of America, starting with July 6, 2020, until December 31, 2020, together with Alin Dumitrascu, as parent of minor." *Id.* (internal quotation marks omitted).

Alin took A.M.B.D. to the United States in July 2020.  But he did not help Violeta apply for a green card.  And he did not return A.M.B.D. to Romania by the December 31 deadline to do so.  Violeta then filed for divorce in Romania and launched these proceedings seeking A.M.B.D.'s return to Romania.

The district court found that Romania was A.M.B.D.'s habitual residence when Alin retained her in the United States.  It therefore evaluated whether Alin's retention of A.M.B.D. breached Violeta's custody rights under Romanian law, concluded that his retention did, and ordered A.M.B.D.'s return to Romania pending custody proceedings there.  Alin challenges the district court's finding that A.M.B.D. habitually resided in Romania.

3

## II. Discussion

"Under the Hague Convention . . . , a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." *Monasky v. Taglieri*, 140 S. Ct. 719, 722–23 (2020). "[A] first-instance habitual-residence determination is subject to deferential appellate review for clear error." *Id.* at 723. But we review the district court's "conclusions regarding principles of domestic, foreign, and international law *de novo*." *Watts v. Watts*, 935 F.3d 1138, 1144 (10th Cir. 2019) (internal quotation marks omitted). And A.M.B.D.'s return to Romania does not moot this appeal because "the return of a child under the Hague Convention does not moot an appeal of the return order." *Monasky*, 140 S. Ct. at 725.

### A.    The Date for Determining A.M.B.D.'s Habitual Residence

Alin argues the district court erred by evaluating A.M.B.D.'s habitual residence immediately before the date he *removed* her from Romania—*i.e.*, July 8, 2020—instead of the date he *retained* A.M.B.D. in the United States without Violeta's permission—*i.e.*, December 31, 2020.

Violeta agrees the district court should have decided where A.M.B.D. habitually resided immediately before Alin retained her in the United States. But she contends the district court did exactly that.[1]

---

[1] Violeta also argues this issue—*i.e.*, whether the district court should have made a finding on where A.M.B.D. habitually resided immediately before her retention in the United States—was not preserved in the district court and that Alin therefore waived his argument by failing to argue for plain-error review in his

We agree with Violeta that the district court found A.M.B.D. habitually resided in Romania on the date Alin *retained* her in the United States without Violeta's permission. The court titled the section of its order deciding A.M.B.D.'s habitual residence by reference to A.M.B.D.'s retention, not her removal, asking: "Where was A.M.B.D.'s habitual residence at the time of her retention?" Aplt. App., vol. 2 at 30 (boldface omitted). And the court ultimately found "that A.M.B.D.'s habitual residence at the time of her removal to the United States on July 8, 2020, *and subsequent retention in the United States*, was Romania." *Id.* at 31 (emphasis added); *see also id.* at 36 (finding "that A.M.B.D. was 'at home' in Romania when she was wrongfully *retained*" (emphasis added)). We therefore reject Alin's first claim of error.

**B.     The District Court's Habitual Residency Finding**

Alin next contends the district court clearly erred in finding that A.M.B.D. habitually resided in Romania.

---

opening brief. "The question we ask" in deciding whether an "issue was preserved below" "is whether the district court was adequately alerted to the issue." *United States v. Garcia*, 936 F.3d 1128, 1132 (10th Cir. 2019) (internal quotation marks omitted). In her petition, Violeta asked the district court to find that "[t]he Child was habitually a resident with [Violeta] in Romania within the meaning of Article 3 of the Convention immediately before her removal *and retention* by [Alin]." Aplt. App., vol. 1 at 15 (emphasis added). And, as we hold below, the district court made the requested finding. The district court was therefore adequately alerted to the issue for us to consider it on appeal. *See Garcia*, 936 F.3d at 1132 ("[I]f the district court was adequately alerted to the issue, and perhaps even responded to the issue, then we are able to review on appeal." (internal quotation marks omitted)).

"The Hague Convention does not define the term 'habitual residence.'"
*Monasky*, 140 S. Ct. at 726. "A child 'resides' where she lives. Her residence in a
particular country can be deemed 'habitual,' however, only when her residence there
is more than transitory." *Id.* (citation omitted). "The place where a child is at home,
at the time of removal or retention, ranks as the child's habitual residence." *Id.*
"Because locating a child's home is a fact-driven inquiry, courts must be sensitive to
the unique circumstances of the case and informed by common sense." *Id.* at 727
(internal quotation marks omitted). "There are no categorical requirements for
establishing a child's habitual residence," *id.* at 728, and "[n]o single fact . . . is
dispositive across all cases," *id.* at 727. Instead, "[t]he inquiry into a child's habitual
residence . . . cannot be reduced to a predetermined formula and necessarily varies
with the circumstances of each case." *Id.* (internal quotation marks omitted).

A petitioning parent bears the burden of proving a child's habitual residence in
the applicable country by a preponderance of the evidence. *See* 22 U.S.C.
§ 9003(e)(1)(A); *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013). Alin offers
four reasons the district court erred in finding Violeta satisfied her burden of proving
A.M.B.D. habitually resided in Romania.

First, Alin argues the district court erred in weighing the couple's intent on
where to raise A.M.B.D. He points to evidence that when they first went to Romania
and for some time thereafter, he and Violeta shared an intent to raise A.M.B.D. in the
United States. And he argues the district court erred by allowing Violeta's changed

6

intent, to raise A.M.B.D. in Romania, to trump his steadfast intent to raise A.M.B.D. in the United States.[2]

Alin is correct that "'the intentions and circumstances of caregiving parents are relevant considerations.'" Aplt. Opening Br. at 19 (quoting *Monasky*, 140 S. Ct. at 727). "But a court must consider all the facts and circumstances concerning the couple's intended stay in the country." *Watts*, 935 F.3d at 1145. Here, Alin and Violeta shared an intent to return to the United States "*as a family*." Aplt. App., vol. 2 at 30 (emphasis added). They "never had a shared, mutual intent to live apart." *Id.* at 31. And when Violeta's green card expired in November 2019, the family could no longer live together in the United States. The district court weighed the impact of this changed circumstance on the couple's prior intent, alongside other facts, including the couple's joint effort to secure an affidavit time-limiting A.M.B.D.'s travel away from the only country she had ever lived in, and found that "the parties' pre-birth intent [was] outweighed by their intent and conduct thereafter." *Id.* at 37. We decline Alin's invitation to re-weigh the evidence on appeal. *See United States v. Gilgert*, 314 F.3d 506, 515–16 (10th Cir. 2002) ("On clear error review, our role is not to re-weigh the evidence . . . .").

---

[2] To the extent Alin argues Violeta could only prevail by showing a shared parental intent to raise A.M.B.D. in Romania, we reject this argument as contrary to *Monasky*. *See* 140 S. Ct. at 726 (holding that "the determination of habitual residence [for an infant] does not turn on the existence of an actual agreement" "between the parents on where to raise their child").

Second, Alin argues that "[o]utside of [Violeta's] unilateral actions, the district court had little to rely on to support its conclusion that A.M.B.D.'s habitual residence was Romania." Aplt. Opening Br. at 37. We disagree. The evidence shows A.M.B.D. was born in Romania, lived there for ten months—accumulating various possessions[3] and building relationships with extended family in Romania during that time—and only left Romania via a travel document that limited her legal absence to less than six months.[4] Also, both of her parents could legally live in Romania, whereas only her father could legally live in the United States. These facts support a finding that A.M.B.D. was "at home," *Monasky*, 140 S. Ct. at 726, in Romania. *Cf. United States v. Chavez*, 734 F.3d 1247, 1250 (10th Cir. 2013) ("A finding of fact is not clearly erroneous unless it is without factual support in the record, or unless the court after reviewing all the evidence, is left with a definite and firm conviction that the district court erred." (internal quotation marks omitted)).

Third, Alin highlights evidence that could support a finding A.M.B.D. was habitually resident in the United States. He points to the couple's joint efforts to secure U.S. citizenship for A.M.B.D., a delay in A.M.B.D.'s trip to the United States

---

[3] Alin argues the district court erred when it "found that A.M.B.D. had a bicycle in Romania" because Violeta testified that the bicycle in question did not belong to A.M.B.D., but instead belonged to the family. Aplt. Opening Br. at 40. This argument misconstrues the district court's finding, which was that "[t]he *family's* belongings in Romania include . . . a bicycle." Aplt. App., vol. 2 at 20 (emphasis added).

[4] Alin does not challenge the district court's finding that Romanian law required him to return A.M.B.D. to Romania by December 31, 2020.

8

by about a month due to the COVID-19 pandemic, Violeta's efforts to help Alin secure employment in the United States, and a catalogue of A.M.B.D.'s possessions in the United States. But this evidence does not lead us to "a definite and firm conviction that the district court erred," *Chavez*, 734 F.3d at 1250 (internal quotation marks omitted).

Starting with A.M.B.D.'s citizenship, the Hague Convention's writers "deliberately chose 'habitual residence' for its factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." *Monasky*, 140 S. Ct. at 727. And Alin does not cite any evidence that A.M.B.D.'s legal citizenship bore any relation to where she was "at home," *id.* Regarding the delay in A.M.B.D.'s trip to the United States, even if A.M.B.D.'s flight had not been delayed, her earlier departure on a limited-duration trip would not sway the habitual residence analysis. Violeta's efforts to help Alin find a job and A.M.B.D.'s accumulation of possessions in the United States might lend support to the conclusion A.M.B.D. had taken up habitual residence in the United States, but they do not compel it on the factual record before the district court.

Fourth, Alin argues the district court erred by failing to discuss evidence pertaining to A.M.B.D.'s acclimation in the United States during the period between July 8 and December 31, 2020, in its section addressing A.M.B.D.'s habitual residence. But as a general rule, "the district court is not required to make findings as to every detail. Findings are sufficient if they indicate the factual basis for the court's general conclusion as to ultimate facts and are broad enough to cover all

material issues." *Hjelle v. Mid-State Consultants, Inc.*, 394 F.3d 873, 880 (10th Cir. 2005) (citation and internal quotation marks omitted)). *Cf. Nulf v. Int'l Paper Co.*, 656 F.2d 553, 561 (10th Cir. 1981) (observing that "a trial court is not a dictating machine" and that "[i]ts findings do not have to contain evidence supporting every possible viewpoint") (discussing Fed. R. Civ. P. 41 and 52). And in this case, the district court's order makes it clear the court was aware of and considered evidence of A.M.B.D.'s acclimation in the United States after July 8, 2020, by discussing some of that evidence in a later section of its order. *See* Aplt. App., vol. 2 at 45 (recounting undisputed witness "testimony that A.M.B.D. has had a happy childhood with her father and grandparents in Colorado").

### III.  Conclusion

We affirm the district court's order.

Entered for the Court

Bobby R. Baldock
Circuit Judge